**In re F. L. ROSS ENTERPRISES, INC. et al., Debtors.**

**Michael T. GERKEN, Plaintiff,**

v.

**Fred L. ROSS, Defendant.**

**Bankruptcy No. B–2–78–2746. Joint Administration Adv. J.**

United States Bankruptcy Court, S. D. Ohio, E. D.

March 19, 1982.

John J. Duffey, Columbus, Ohio, for plaintiff.

Dennis J. Fennessey, Columbus, Ohio, for defendant.

Alec Wightman, Columbus, Ohio, for Western Natural Gas Co.

## OPINION AND ORDER ON COMPLAINT TO RECOVER PROPERTY

R. J. SIDMAN, Bankruptcy Judge.

This matter is before the Court on the merits of a Complaint to Reclaim Property filed on June 19, 1980, by Michael Gerken ("Gerken") against F. L. Ross Enterprises, Inc. ("Ross Enterprises"), a Chapter XI debtor. The gravamen of the complaint is that certain shares of stock of Pro-Energy Services, Inc. ("Pro-Energy") are subject to an express trust agreement between Gerken and Ross which requires the re-transfer of such stock by Ross to Gerken. The complaint was amended on July 10, 1980, to add WNGC, Ohio Inc. ("WNGC"), Thomas P. Guisti, Receiver ("Guisti"), and Western Natural Gas Co. ("Western") as parties defendant. By agreement of all parties, a second amended complaint was filed on October 2, 1980, adding Fred L. Ross ("Ross") individually, as a defendant, and on October 2, 1980, defendants Western, WNGC, Guisti and Ross Enterprises were voluntarily dismissed as parties defendant. Following an answer and counterclaim filed by Ross, and a reply to counterclaim filed by Gerken, the matter was tried to the Court. Post-trial briefs were submitted by both parties and the matter is now before the Court for decision. The Court finds the following facts. These factual findings will speak to time periods relevant to the contested issues in this case, even though such facts may have changed subsequently by virtue of events occurring in relation to confirmation of the Chapter XI Plan of Reorganization of Ross Enterprises and its related entities and otherwise.

The parties to this suit were engaged in several business enterprises, either jointly, individually or in concert with other individuals. These enterprises include J. T. Gerken Trucking ("Gerken Trucking"), Petroleum Purchasers Inc. ("PPI"), Olanco, Pro-Energy Services, Inc. ("Pro Energy"), Federal Petroleum Lease Services Inc. ("FPLS"), and Olanco Gas Transmission Co. The organization, operation, function and interrelationships among these various entities will be set out in an attempt to understand the allegations contained in the complaint.

Gerken Trucking was a trucking business in which Gerken owned approximately 25% of the stock and served as secretary-treasurer at a salary of approximately $15,000–$18,000 per year. The attorney for Gerken Trucking was David Pemberton, and the company filed in another bankruptcy court in 1977 a Chapter XI proceeding under the provisions of the Bankruptcy Act of 1898. Gerken Trucking had a 5% minimum limited partnership interest in one of the Pro-Energy oil and gas programs.

FPLS was a company whose ownership was not clear and which does not appear important for purposes of this suit. Both the plaintiff and the defendant had interests in FPLS however.

Olanco Gas Transmission Co. was a short-lived company, solely owned by Gerken. Its function, which is not important in this lawsuit, was to build a pipe line.

Petroleum Purchasers Inc. ("PPI") was an oil brokerage firm which bought oil from producers and sold it to refineries. It bought oil from various independent producers and delivered it mainly to Pennzoil and occasionally to other refiners. Gerken, who was the president of PPI, was unsalaried but was paid expenses. Gerken executed contracts for the purchase of crude oil which PPI's employees picked up from producers and delivered to refiners. Gerken owned 75% or more of PPI's stock at any given time, although his increasing involvement with Gerken Trucking caused him to leave progressively more of PPI's management to other employees. PPI bought its crude oil from various Pro-Energy limited partnerships as well as from 30 to 40 other companies and then sold the oil principally to Pennzoil.

In late 1974 or early 1975, PPI negotiated with Armco Steel for a contract to buy Armco's production from 20–30 wells. In preparation for the execution of this proposed contract, PPI made certain expenditures, including securing at least one $25,-

000 loan from Gerken Trucking. The contract with Armco failed to materialize and as a result, PPI suffered large losses. Following those losses in 1975 and other financial difficulties, PPI was put into state court receivership on February 3, 1976. Included in the debts scheduled in the receivership, as shown on the somewhat confused company books, was a debt owed to Pro-Energy for oil picked up in December, 1975 and January, 1976. The actual amount of this debt has been stipulated to be $25,018.65. Although Pro-Energy filed a claim in the state court receivership, the only funds disbursed by the state court receiver were to the Internal Revenue Service.

Olanco was a company whose primary function was to secure oil and gas leases from farmers and landowners and perform "turnkey" operations for Pro-Energy. Pro-Energy would raise the money from investors to drill a given well, based upon Olanco's cost estimates, and Olanco, with advances on these funds from Pro-Energy, would then actually drill the well and prepare it for production. When the well was completed, it would be turned back to Pro-Energy which would pay Olanco for its services. The amount of funds raised by Pro-Energy to drill a well was based upon Olanco's estimates, and the risk of underestimation fell upon Olanco. Ownership of Olanco was split between Gerken and Ross with each having 250 shares. Olanco also owned some shares of PPI.

Pennzoil made three loans to Olanco of $25,000 each for well completion costs. Olanco repaid some of these loans and some payments remain to be made from production of wells Olanco still has in production. Although Gerken, as the negotiator of the loans from Pennzoil and the unsalaried president of Olanco, probably had personal liability for these loans, and Ross, as half owner, may have had personal liability, Pennzoil has never made any demand upon Gerken personally for repayment of any of the $75,000.00. Pro-Energy did repay some of the debt to Pennzoil, however. Olanco further made personal loans to Gerken and his brother at various times.

Pro-Energy, the most significant entity in this proceeding, was organized to raise money from investors for drilling oil and gas wells. Pro-Energy actually served as the general partner and agent of the many limited partnerships which owned individual wells based upon payment of the required monies needed to fund a well program as estimated by Olanco. Five hundred shares were issued in Pro-Energy originally—250 to Gerken and 250 to Ross with Gerken serving as unpaid president and both Gerken and Ross serving as signatories for checks issued from Pro-Energy. Pro-Energy operated the wells following turnover from Olanco and served as agent for the distribution of the proceeds from the sale of the oil and gas produced from such wells when paid by PPI. In turn, Pro-Energy received a share from each limited partnership for its services as general partner and had its expenses paid.

Normally PPI paid Pro-Energy and Pro-Energy paid its investors within 30–45 days after the oil or gas production was picked up, but there was no formal agreement regarding the timing of such payments. Ross individually was also a limited partner in several of the Pro-Energy limited partnerships packages.

Allen Blue served as attorney for the incorporation of Pro-Energy and for setting up the various limited partnerships, and David Pemberton completed some of the incorporation documents. Pro-Energy derived 96% of its income from the sale of oil and 4% from the sale of gas with its oil being sold exclusively to PPI and its gas to Newzane.

At the time PPI went into receivership, PPI owed money to Pro-Energy. The exact amount of that debt, stipulated at $25,018.65, was eventually written off as a bad debt by Pro-Energy. Pro-Energy did pay some of the money owed to Pennzoil, however. Michael Wright ("Wright"), who later became a shareholder of Pro-Energy, made a personal loan either to Ross or Pro-Energy to cover the debt owed to Pro-Energy from PPI so that investors would not fail to receive the amounts due them.

Wright later became a shareholder of Pro-Energy, presumably as repayment of this loan obligation. After the stock transfer, Ross also changed the terms of his compensation, and the records reflect that in 1976 Ross had a salary of $85,200, in 1977 his salary was $65,000 and commissions were $66,000.

This background information regarding the various companies and ownership rights in each is necessary to understand the allegations contained in the complaint to reclaim property and to assess the significance of the chronological events entered into the record.

The issue in this proceeding involves the circumstances under which stock of Pro-Energy was transferred from Michael Gerken to Fred Ross. Gerken alleges in his complaint that the transfer of Gerken's one-half ownership of Pro-Energy was made under an agreement of express trust by which Ross was to hold those shares in trust for the benefit of Gerken for a minimum of six (6) months until Gerken could get all the difficulties with PPI worked out and until his involvement with Pro-Energy as an owner would be acceptable to customers of Pro-Energy. All the shares then held by Ross were subsequently transferred to F. L. Ross Enterprises, Inc. and were eventually transferred to WNGC, Ohio Inc., a subsidiary of Western Natural Gas Co., the proponent of the Chapter XI Plan of Arrangement confirmed in *In re F. L. Ross Enterprises*, Case No. B–2–78–2746 (S.D.Ohio). Gerken seeks 50% of the original shares of Pro-Energy now held by WNGC, Ohio Inc. which represents the shares he transferred to Ross in early 1976 minus the 5% later transferred to Wright. Ross, in his answer, denies the existence of a trust arrangement, and asserts various defenses based upon the statute of limitations, estoppel, parol evidence and laches. He also asserts a counterclaim against Gerken for breach of a promise to pay for oil and services purchased from Pro-Energy.

The Court finds the following events, in the chronological sequence set out, to be significant findings of fact in the recon-struction of the events which led up to the transfer of Pro-Energy stock from Gerken to Ross.

Gerken and Ross first met in 1973. On December 24, 1974, they, each with 50% ownership of 500 shares for each company, together formed the companies known as Pro-Energy and Olanco. By May of 1975, Ross had become very involved in the day to day operations of Pro-Energy and, at that same time, throughout 1975, Gerken was serving as president of PPI, secretary-treasurer of Gerken Trucking, president of Olanco, and president of Pro-Energy.

In October of 1975, Mr. and Mrs. Gerken and Mr. and Mrs. Ross went to Spain. They all returned to the United States (Boston) on the evening of October 24, 1975. This date is significant only as it relates to the dates of execution denoted on several of the corporate documents and as it substantiates the testimony that several of these documents, which were shown on their faces as having been executed on October 24, 1975, by Ross and Gerken, were, in fact, backdated by their attorney. To the extent relevant to the disposition of the merits of Gerken's claim in this case, the Court finds that the primary motivating factor in backdating these various documents was to assure Pennzoil, which was upset over Gerken's involvement with Pro-Energy because of PPI's financial defaults, that Gerken was no longer involved with Pro-Energy and had not been for some time. The backdating did not relate to any factors involving PPI's state court receivership.

Sometime in November of 1975, PPI's payments to its creditors were becoming slow, some bad checks had been issued, and its financial problems were increasing. Gerken testified that by December, 1975 he had become aware of PPI's dire financial straits, and between January 1, 1976 and January 15, 1976, he decided to file a state court receivership for PPI. January 16, 1976 was the last date PPI actually picked up any production, and the state court receivership was initiated on February 3, 1976. At that time PPI was being paid by Pennzoil, but these monies went into gener-

al accounts, and Pro-Energy was not paid some of what it was owed. The amount of this debt was stipulated at $25,018.65.

Sometime either in November, 1975, January 7 or 8, 1976, or January 11 or 12, 1976 (by various portions of Ross testimony), Ross and Gerken, with no other parties present, met at the Imperial House, a motel/restaurant located near the then office location of Pro-Energy. Ross testified that he told Gerken they would have to go their separate ways, and Gerken then agreed to sell his shares of Pro-Energy to Ross for $150.00 which was never paid. Ross testified that Gerken at first insisted on an agreement that Pro-Energy sell all its oil to PPI, but that Gerken later dropped that demand. After the financial plight of PPI became fully known to Ross, Ross also offered to forego suing Gerken for breach of his fiduciary duty in buying oil he couldn't pay for in his capacity as president of PPI, Olanco and Pro-Energy in exchange for Gerken's shares in Pro-Energy. The Court has substantially discounted most of Ross' testimony regarding these various meetings because, in the first instance, the events are not directly relevant to whether an express trust agreement was later entered into between Ross and Gerken, and because, in assessing the credibility of the evidence this Court finds that it is not likely that such meetings, with the attendant conversations, ever took place. More specifically, this Court finds that Ross' threat of suit for breach of fiduciary duty was not a factor in the Ross-Gerken discussions at that time, but only later became a convenient reason for Ross to use in explaining the Gerken stock transfer. This conclusion is reached, in part, by virtue of the Court's examination of a deposition given by Ross in the state court lawsuit over this same issue, a deposition which this Court finds admissible into the record of this case. See Rule 32(a)(1), Fed.R.Civ.P., and Rule 801, Fed.R. Evid.

In his concern over the financial plight of PPI, Gerken went to see attorney David Pemberton, who had also served as attorney for Gerken Trucking. Pemberton recommended that Gerken see another attorney regarding mutual assignments needed to cancel loans and straighten out PPI's affairs on its books. No mutual assignments were executed to or from Pro-Energy as a part of the procedure, but there were mutual assignments executed between Gerken Trucking, PPI, and Olanco.

It is not clear why the Pro-Energy and Olanco corporate books were updated. Ross testified that Gerken needed the updating to "take care of" some priority problems in PPI's receivership. Gerken denied this and stated that the updating was done merely to bring the books up to date. In either case, on January 21, 1976, Gerken took the minute books of Pro-Energy and Olanco to Pemberton for the necessary updating. The uncompleted status of the various documents in the corporate books and the manner in which such documents were completed was the subject of much testimony.

Later in the evening of January 21, 1976, about 8:00 p. m., according to Gerken's testimony, Ross went to Gerken's home. At this meeting Ross told Gerken, in the presence of Gerken's wife, that some customers of Pro-Energy, especially Pennzoil, because of PPI's problems, refused to deal with Pro-Energy as long as Gerken was connected with Pro-Energy in any way. Therefore, Ross wanted Gerken to turn over his stock to Ross for a period of six months to one year until matters cooled down. Gerken agreed to turn over his stock and to resign and thereupon signed some papers to reflect this agreement. The stock transfer was to be entered into the corporate minute books in such a manner as to show that Ross was in control of Pro-Energy and Olanco. Gerken testified that the agreement was that Ross was to hold the stock in trust for Gerken until the problems with PPI were settled and some time had elapsed, and then Ross would transfer the stock back to Gerken or to anyone Gerken chose. According to Gerken, they also agreed that Ross was to be paid $18,000.00 per year for his handling of Pro-Energy, and any earnings above the $18,000.00 were to be split fifty-fifty between Ross and Gerken. Ross testified, on the other hand, that by October or

November, 1976, he was authorized to take $50,000.00 per year as salary from Pro-Energy. Gerken further stated that he signed his letters of resignation from Pro-Energy and Olanco on that evening of January 12, 1976, even though they were dated October 24, 1975.

On January 23, 1976, the new documents prepared for the Pro-Energy corporate minute book by Pembererton were completed. These included specifically the December 24, 1974 Minutes of Actions of Sole Incorporator (backdated), the Consent and Authorization of Shareholders dated January 21, 1976, the Director Minutes dated December 24, 1974 (backdated), the Stock Certificate specimen, the two Actions by Written Consent of Directors, dated October 24, 1975 (backdated), and the original of stock certificates # 1 and # 2. Gerken signed the stub to stock certificate # 1 and all the other documents where his signature was needed and forwarded the documents to Ross except for stock certificate # 1 which he kept.

To the extent helpful to an understanding of the dealings between Ross and Gerken, and to the minimal extent relevant to a determination of the basic issues in this case, the Court finds that documents in the corporate minute book of Pro-Energy were prepared as follows:

### 1. Corporate Documents.

The Articles of Incorporation and the original Appointment of Agent, prepared by Allen Blue, were dated December 24, 1974, and were in the corporate minute book before January 21, 1976. The receipt for $525.00 dated February 19, 1976, was paid by Pro-Energy and was not in the book as of January 21, 1976, as was also true of the certificate from the Secretary of State dated February 18, 1976. The Certificate of Amendment to the Articles of Incorporation, dated February 12, 1976, was not in the book on January 21, 1976, and was prepared by Allen Blue after that date.

### 2. Shareholder Minutes.

The Minutes of Actions of Sole Incorporator, dated December 24, 1974, were actually prepared at a later date by David Pemberton and backdated to a time when the actions occurred. These minutes were not in the book on January 21, 1976. The Consent and Authorization of Shareholders, dated December 24, 1974, was not in the book on January 21, 1976, and was prepared by Pemberton in late January 1976 and backdated. The Action of Written Consent of Shareholders, dated October 24, 1975, which states the date of Gerken's resignation and fixes the number of directors at one, was not in the book on January 21, 1976, and was not prepared by Pemberton. The letter, dated October 24, 1975, to Fred Ross from Gerken stating that Gerken was resigning as officer and director of Pro-Energy was not in the book on January 21, 1976, was backdated, but was not prepared by David Pemberton. The actual date it was signed by Gerken and how it got into the book are disputed. The Minutes of Actions Taken in Writing by the Sole Shareholder of Pro-Energy Services, Inc., dated January 5, 1976, were also not in the book on January 21, 1976, but were prepared later by Attorney Blue. The date of insertion is not clear. The Minutes of Actions Taken in Writing by the Sole Shareholder, dated February 2, 1976, were not in the book on January 21, 1976, but were prepared later by Blue or Ross. The remainder of the sole shareholder minutes were all prepared subsequent to January 21, 1976, and were not in the book at that time.

### 3. Other Documents.

The Code of Regulations was in the book on January 21, 1976, and was prepared before that date by Attorney Blue.

The first entry in the Director Minutes, dated December 24, 1974, was not in the book on January 21, 1976, but rather was prepared by Pemberton and backdated to coincide with the date of incorporation. The Stock Certificate specimen (Exhibit A) was prepared by Pemberton and was not in the book on January 21, 1976. The Certified Resolution, dated December 24, 1974 (Exhibit B), is thought to have been already

in the book on January 21, 1976, but this fact is not certain. The Actions by Written Consent of Directors, dated October 24, 1975, was prepared by Pemberton, and was not in the book on January 21, 1976. This document was backdated, but the actual date of preparation and signature is not clear. Likewise the second Actions by Written Consent of Directors, dated October 24, 1975, was also not in the book on January 21, 1976, and was backdated. The Minutes of Actions Taken in Writing Without a Meeting by all the Directors of Pro-Energy Services, dated January 5, 1976, were not in the book on January 21, 1976, and were not prepared by Pemberton at the time the corporate books were being updated. The same is true of the Actions by Written Consent of Director, dated January 5, 1976. The remainder of the Actions of the Sole Director, contained in the corporate minute book, and the Pro-Energy Services Executive Medical Care Plan are subsequent to the relevant dates in this suit.

The Stock Ledger section of the Pro-Energy corporate book has several entries of interest to this suit. First is a list of shareholders of Pro-Energy with the certificate number, name of the shareholder and number of shares. This document was not in the book on January 21, 1976, and was not prepared by Pemberton, nor by Blue, according to his testimony. Its origin is somewhat uncertain. Stock Certificate # 1 for 250 shares to Michael Gerken was *not* in the book on January 21, 1976, but the original was prepared by Pemberton. The copy admitted into evidence is not an exact copy of the original, and Pemberton denies preparation of the copy. It is dated December 30, 1974, and Pemberton had his secretary write "cancelled" on the original document after January 24, 1976, when the stock was transferred to Ross. The transfer certificate for this stock certificate was not in the book on January 21, 1976, although it is dated October 24, 1975. Stock Certificate # 2 with 250 shares to Ross was prepared by Pemberton, and the stub was filled in by Pemberton's secretary. Pemberton did not recall that the stub on the back of this certificate was filled in when

he saw the book on January 21, 1976. The certificate stub, dated December 30, 1974, was not in the book on January 21, 1976. Stock Certificate # 3 and the stub with the transfer dated December 30, 1974, and an original issue date of October 24, 1975, showing 250 shares issued to Ross from Gerken is not correctly dated and was not in the book on January 21, 1976. Rather it was prepared in February of 1976 by Pemberton's secretary. The remainder of the stock certificates numbered 4 and higher and the compensation agreement dated January 1, 1977, post-date the time of this dispute and are therefore not relevant.

█ Although there was much testimony concerning the dates of these various documents, who prepared them, and what their actual dates of execution were as compared to the dates shown on the documents themselves, much of this date is not actually contested and may not be especially relevant to the decision of this proceeding. And while this Court's recitation of these matters may be somewhat confusing, it does serve to illustrate the rather cavalier approach of both Gerken and Ross to matters of import and the difficulty thus imposed upon this Court in sorting out the actual events in their proper sequence. Also, to the extent the parol evidence rule was asserted by Ross to strike all testimony that may have tended to contradict the actual dates on the various documents, the Court hereby overrules the objection. See 30 Am.Jur.2d *Evidence* § 1039. Parol evidence may be introduced to vary a date on an instrument where the date is material to resolution of the issues of the case. See *Shelton v. American Insurance Union*, 41 Ohio App. 512, 181 N.E. 497 (1931).

Sometime between January 24, 1976 and February 4, 1976, Gerken talked with Pemberton by phone regarding his agreement to turn his stock in Pro-Energy over to Ross for a limited period of time so that Pro-Energy could satisfy Pennzoil's wishes that Gerken not be connected with Pro-Energy. Pemberton testified that he advised Gerken either to get a written trust agreement, to get a buy-sell agreement simultaneous with

the transfer, or at least to get a transfer endorsed in blank, which would not appear on the company books, that Gerken could keep in his possession so that he could control the transfer if there were a failure of consideration.

On February 3, 1976, PPI actually filed for a state court receivership. On the following day Gerken went to the Pro-Energy offices and had his Stock Certificate # 1 endorsed and witnessed. This was backdated to December 30, 1974, but actually was executed on February 4, 1976. Gerken then mailed certificate # 1 with the stub and with a memo to Pemberton's secretary to transfer the stock to Ross with an endorsement on the back: "I hereby sell, assign and transfer unto Lawrence T. Gerken and to Michael T. Gerken shares etc." Following this, he left for a trip to Florida.

February 5, 1976, the next date for consideration, is a focal date in this lawsuit. Gerken testified that he received a call from Ross on that day saying that the Pennzoil audit was imminent and that the stock matter needed to be cleared up. Gerken told Ross the stock certificate had already been mailed to Pemberton's office with instructions to have the stock representing certificate # 1 transferred to Ross and endorsed back to L. Gerken (Michael Gerken's brother) and M. Gerken. Ross was upset over this arrangement and insisted that the transfer be without the endorsement on back, and that Gerken should trust him. Gerken agreed to do as Ross requested and called Pemberton's office and told Pemberton to transfer the stock clean, even though this was against Pemberton's advice and even though certificate # 3 with its transfer back to L. and M. Gerken had already been prepared. Gerken reasoned that Pro-Energy was worthless without the Pennzoil contract and if Ross insisted on a "clean transfer" to preserve the Pennzoil account, Gerken was willing to go along with this with the understanding that the stock would be retransferred to him after 6 months had passed or Gerken's involvement had become acceptable.

Following preparation as directed, Ross came into Pemberton's office and picked up the certificate and cover letter. He also picked up the Pro-Energy corporate minute book, and Pemberton performed no more services for Pro-Energy after February 5, 1976.

Pemberton's secretary, Margaret West, testified that Ross first became aware of the provision of transfer back to L. and M. Gerken when he called her on February 5 to see if the certificate had been prepared. She stated that Ross became very angry and that later in the day Pemberton told her to destroy the first prepared certificate # 3 and fill one out without the transfer language. After preparing the new certificate # 3 and typing the cover letter dictated by Pemberton, she called Ross to tell him it was ready. Ross then picked up certificate # 3 and the cover letter as well as the Pro-Energy corporate minute books which Ross took to attorney Blue's office.

Through oversight, the original of certificate # 1 remained in the file at Pemberton's office and was not included with the corporate minute book which was picked up by Ross on February 5. How a purported copy of certificate # 1, which is not an exact copy of the original certificate # 1, actually got into the minute book as introduced into evidence, has not been explained to the Court. Pemberton did not speak with Ross personally on February 5, according to his testimony, and the minute books of Pro-Energy and Olanco were never returned to his office.

Ross' account of the events of February 5, 1976, is that Pemberton asked him to sign the certificate transferring the stock back to L. and M. Gerken and that he refused and threatened to start a new company. Then Pemberton called Gerken in Florida after which Pemberton asked his secretary to prepare another certificate without the transfer to L. and M. Gerken. Regardless of which account of February 5 is believed, however, it is clear that Gerken initially intended to transfer his stock with a retransfer to L. and M. Gerken. When this became unacceptable to Ross, the retransfer

was removed, and the stock was transferred without it.

On February 18, 1976, attorney Blue amended Pro-Energy's Articles to authorize issuance of 10,000 shares. Michael Wright was to then get 1,000 of these and an interest in Pro-Energy # 1 limited partnership in return for a loan of capital to Pro-Energy. This action essentially gave Wright 10% ownership in Pro-Energy (the other 90% was transferred to Ross) and the transfer to Wright is not disputed by Gerken or Ross. Gerken testified that he and Ross had agreed, probably in the fall of 1975, to each give Wright 5% of their shares. On March 15, 1976, Blue prepared certificate # 5 transferring 10% of the company's shares to Wright.

In late August of 1976, Gerken talked with Pemberton regarding some legal fees Pemberton was owed for services for Olanco, Pro-Energy and Olanco Gas Transmission Co. Pemberton and Gerken met at the Hilton Inn North in late August, 1976, and then went to the nearby Pro-Energy offices to see Ross. Gerken wanted Pemberton to go with him to discuss the stock retransfer since six months had lapsed and he had heard that Pennzoil now had new monies. Ross was not in the office, but they left a message for him to call Pemberton. Ross, upon calling Pemberton, agreed to personally pay Pemberton's fees for services to the various companies. At that same time, Ross told Pemberton that Gerken had no shares in Pro-Energy. Ross did indicate he might pay a nominal amount for any equitable interest Gerken had in the shares, but no monies were ever paid. On August 27 Pemberton wrote Gerken a letter relating to Gerken what Ross had told him concerning Gerken's lack of any claim to either Pro-Energy or Olanco stock and sent on to Gerken a letter Pemberton had received from Ross dated August 25, 1976. Pemberton's letter also stated that Ross insisted that Pemberton had not handled the Pro-Energy transfer but only the Olanco transfer and that any testimony Pemberton might give would be for naught. Ross then disclaimed, in this letter of August 25th, any knowledge of a trust transfer. In late 1976 or early 1977, when Gerken had decided litigation would be necessary, Pemberton sent Gerken to another attorney since Pemberton knew he would have to testify regarding the facts surrounding the stock transfer.

In June of 1978 Gerken talked with John Duffey, his present attorney in this action, and on July 29, 1978, the complaint of Michael Gerken against Fred L. Ross over the stock transfer was first filed in Franklin County Common Pleas Court.

The Court must decide which conflicting variations of this sequence of events to believe. Were the shares of Pro-Energy transferred to Ross from Gerken subject to an express trust agreement or were they simply transferred free and clear of any claims by Gerken in exchange for Ross' forebearance in bringing a suit against Gerken for alleged breaches of fiduciary duty?

■ The Court, after studying the testimony of the parties and the various witnesses, considering their demeanor and noting the contradictions found in certain portions of the testimony, believes and finds that an agreement of express trust had been arrived at prior to the transfer of the stock. The agreement for such trust was reached on January 21, 1976, when Ross and Gerken met at Gerken's home. The elements necessary for the creation of an express trust are present. The circumstances and the testimony have shown the Court in a clear and convincing fashion that a trust arrangement was intended. The existence of a trust arrangement is the fair and reasonable interpretation of the acts of both Gerken and Ross. Ross needed Gerken out of the Pro-Energy operation to appease Pennzoil, but the effect of PPI's troubles upon Pro-Energy was considered temporary by both parties, and it was intended that Gerken's Pro-Energy stock be retransferred to him following the passage of sufficient time for the PPI matter to be forgotten. No bad feelings or disagreements between the parties prior to the problems with PPI were testified to. The intention of Gerken

was to transfer his shares of Pro-Energy stock to Ross for Ross to hold in trust for Gerken. Gerken had the required capacity to create such a trust, the terms and the subject matter of the trust were clear, Gerken himself was the intended beneficiary, and the oral creation by agreement was sufficient. The creation took place on January 21, 1976, at Gerken's home, and the delivery occurred on February 5, 1976, when Ross took the executed transfer of the shares of Pro-Energy stock. No consideration was needed. Repudiation of the trust then occurred on August 25, 1976, the date of Ross' letter to Pemberton which stated that no trust arrangement existed.

The Court finds, however, that the record is far from clear on establishing a further agreement between the parties, Gerken and Ross, that Fred Ross was to be paid a salary of $18,000.00 per year while he served as president and chief officer of Pro-Energy and that any net profit above that amount was to be divided fifty-fifty between the two parties. Thus, any further discussion of the express trust agreement will be confined to the single element which has been clearly established, the agreement to retransfer the 250 shares back to Gerken. However, the Court also finds that Gerken and Ross consented to the 10% ownership of Pro-Energy subsequently issued to Dr. Wright and that any discussion of damages must take this transfer into account.

The various defenses to the finding of an express trust arrangement advanced by Ross include a statute of limitations bar, a statute of frauds problem, accord and satisfaction, the parol evidence rule and assertion of various equitable doctrines. The Court will attempt to deal with these defenses on their merits.

### STATUTE OF LIMITATIONS (Statute of Frauds)

Based upon the previous findings of fact made by this Court, the relevant dates to be considered in evaluating the merit of Ross' defense of the statute of limitations are: (1) January 21, 1976—the date the express trust agreement was made; (2) February 5, 1976—the date of delivery of the res of the trust agreement, the 250 shares of Pro-Energy stock; (3) August 25, 1976—the date of the Ross letter repudiating the trust agreement; (4) July 29, 1978—the date upon which Gerken filed a complaint against Ross in the Court of Common Pleas of Franklin County, Ohio, over the stock transfer dispute; (5) December 7, 1978—the date upon which an original petition under Chapter XI of the Bankruptcy Act of 1898 was filed by Pro-Energy, Ross Enterprises and other related entities; (6) June 19, 1980 —the date of filing of the present adversary proceeding which named only Ross Enterprises as a defendant; (7) September 29, 1980—the date of an *agreed* entry (including the agreement of the attorney for Ross) by which Gerken was given leave to file a Second Amended Complaint joining, for the first time, Ross as a new party defendant, and further providing that the Court had subject matter jurisdiction over the Gerken-Ross dispute and that Ross voluntarily entered his personal appearance in the action; (8) October 2, 1980—the date of Gerken's Second Amended Complaint naming Ross as a new party defendant and the date of the voluntary dismissal by Gerken of all other defendants previously named; and (9) October 16, 1980—the date of Ross' answer to the complaint.

Ross asserts that any one of several possible statutes of limitations bars Gerken from obtaining the relief requested. The statutes include § 2305.09 of the Ohio Revised Code (4 years on an action based in fraud), § 1707.43 of the Ohio Revised Code (2 years on an action based upon an unlawful sale of securities), or § 1335.05 of the Ohio Revised Code (1 year on an action based on an oral contract not to be performed within one year—the Ohio Statute of Frauds).

Gerken asserts that none of these limitations applies and that the proper statute is § 2305.07 of the Ohio Revised Code, a six-year statute for contracts not in writing.

The Court hereby finds that Gerken's present action is not barred by any applicable statute of limitations. Because the four-year limitation contained in § 2305.09 applies only to actions based in fraud, and

because fraud is not the basis for recovery asserted in Gerken's complaint, Gerken's action is not barred by that statute. Further, the two-year limitation contained in § 1707.43 applies to purchases of unlawful securities only. This case only incidentally involves a security because a security was the trust *res.* In no fashion can it be successfully asserted that any statute of limitations contained in any securities laws (state or federal) has applicability to the present action for enforcement of an agreement of express trust. Finally, the Ohio Statute of Frauds (§ 1335.05) is also inapplicable. Trust agreements are not specially mentioned in such statute, and the trust agreement in any event was to be completed within one year and in fact was repudiated only seven months after it was made. See *Winder v. Scholey*, 83 Ohio St. 204, 93 N.E. 1098 (1910). The Court hereby finds that the six-year statute of limitations on oral contracts is applicable in this case, and thus, based upon the January 21, 1976, date of the oral contract, and the October 2, 1980, date of the naming of Ross as a new party defendant in this lawsuit, Gerken's claim is not barred by such statute.

The Court, however, even if it were inclined to apply a shorter statute of limitations in this case, would be persuaded that the July 29, 1978, initiation of a state court suit against Ross would have tolled the running of any statute, and that the conduct of Ross in agreeing (and perhaps even seeking) to have this dispute heard in this Court may estop him from asserting as a defense any statute of limitations which hadn't run as of July 29, 1978. See 51 Am.Jur.2d, *Limitations of Actions*, §§ 438–452. It should also be observed that the Joint Plan of Arrangement confirmed by this Court in the *F. L. Ross Enterprises, et al.* Chapter XI proceeding was specifically agreed to by Fred Ross. That Joint Plan contained the provision that:

"As Disbursing Agent Western Natural Gas Company shall forthwith do the following:

1. Deposit with a trustee designated by the Official Creditors' Committee the sum of 200,000 shares of its common stock in the name of Carolyn A. Ross and Fred L. Ross pursuant to the terms of Paragraph V.A. (5) of the Joint Plan of Arrangement. A portion of said shares shall be designated as the shares claimed by Michael Gerken pursuant to Paragraph V.A. (6)(c) of the Joint Plan of Arrangement and shall be held by the trustee pending a determination by a court of competent jurisdiction of the validity and amount of Michael Gerken's claim to said shares."

It is obvious that Ross expected the Gerken claim to the shares of Pro-Energy to be litigated. And while his agreement to the Joint Plan of Arrangement does not, per se, constitute a waiver of defenses by Ross to the Gerken claim, it does evidence an understanding that, to the extent Gerken's claim (then pending in state court) affected the distribution of Western Natural Gas shares under the Chapter XI Plan, the matter would be resolved in a court of law. This Court perceives no prejudice to Ross that this resolution is made in the bankruptcy court without regard to the time lapse occurring since the July, 1978, filing of the lawsuit in state court.

## ACCORD AND SATISFACTION

Ross claims that Gerken turned over his shares in Pro-Energy to him in satisfaction of the dispute relating to funds alleged to be owed by PPI to Pro-Energy. This Court has already determined, as a matter of fact and based upon the credibility of the testimony on this matter as judged by the Court, that the PPI obligation to Pro-Energy (stipulated at $25,018.65) did not form a basis for the stock transfer from Gerken to Ross. While it may have been true that Ross blamed Gerken for the loss resulting to himself, Pro-Energy and related entities as a result of PPI's failure to pay that obligation, nothing in the record persuades this Court to find that the consideration for the stock exchange was the forgiveness of this debt, especially since the debt was owed by PPI, a separate legal entity from Gerken, the transferor of the stock. The Court further finds that the counterclaim

asserted by Ross against Gerken has not been proved. No liability for any loss (even the existence of a loss is speculative based upon the meager evidence in the record) to Ross can be attributed to Gerken personally.

### "CLEAN HANDS" DEFENSE

The essence of Ross' defense of "clean hands" is that Gerken bears some culpability for the financial collapse of PPI, the subsequent troubles of Pro-Energy with Pennzoil, and the need to disassociate himself with the Pro-Energy operation. Because of this, Ross claims, Gerken ought not now benefit by the return of the trust property—the shares of Pro-Energy. Gerken, however culpable he may have been in the PPI matter, does not bear the burden of proving his innocence before recovery can be allowed on his complaint. It may be deemed proved that the transfer of the Pro-Energy stock by Gerken to Ross was indeed part of a ruse to convince a major customer of Pro-Energy that Gerken was no longer involved in that company. That fact does not, however, in this Court's opinion, so taint Gerken that he should be barred from seeking the return of his shares from Ross upon the subsequent breach of the Ross-Gerken trust agreement.

### DAMAGES

Having found the existence of a trust agreement, and having found no meritorious defense to the enforcement of that agreement, the Court turns to the remedy to be fashioned in order to place the parties in as nearly the same posture as if the agreement had been fully performed. Gerken's complaint contains the following prayer for relief:

"WHEREFORE, plaintiff Gerken prays:
1. For an order imposing a constructive trust upon those shares, or the right to shares, of Western Natural Gas Company held by the Trustees under the Joint Plan of Arrangement for the benefit of Fred L. Ross, equal number to that which is proportionate to or represented by 50% of all outstanding shares of Pro-Energy Services, Inc.

2. For an order imposing an equitable lien on all other shares, or the right to shares, of Western Natural Gas Company held by the Trustees under the Joint Plan of Arrangement for the benefit of Fred L. Ross, to secure personal judgment against defendant Fred L. Ross.

3. For personal judgment against defendant Fred L. Ross for at least $250,000, or such other amount as may be found due and payable to plaintiff as a beneficiary of the trust, plus attorney fees, costs and expenses."

The Court has already determined that the only provision of the trust agreement properly proved is the holding of the 250 shares of Pro-Energy by Ross for the benefit of Gerken. Money damages, then, to the extent that they relate to salaries and/or commissions received by Ross (which were, in fact, substantial during the years 1976 and 1977) are not appropriately awarded to Gerken.

There has been no evidence placed in the record by which this Court can credibly determine the actual value of Gerken's 250 shares of stock at the time of the February 5, 1976, transfer to Ross. Nor is there credible evidence in the record to establish the value of such shares at the time of Ross' repudiation of the trust agreement in August of 1976. The value of Pro-Energy has apparently always been a matter of conjecture, with Ross at times touting its value when the sale of limited partnership interests in oil and gas wells to be sponsored by Pro-Energy was at stake, and with Ross at other times bemoaning the fact that Pro-Energy was worthless.

The value of Gerken's 250 shares can only be fairly determined by measuring what those shares have meant in the allotment given to shareholders in the Joint Plan of Arrangement. Some tracing of those shares is necessary in analyzing the proper remedy to be fashioned in this case. At the time of the February 5, 1976, transfer, Gerken's 250 shares represented a one-half ownership in Pro-Energy. Ross owned the other 250 shares at that time. The evidence

establishes, however, that a pre-existing agreement with a Dr. Wright would have allocated a one-tenth ownership of Pro-Energy to Dr. Wright, thus making the Ross/Gerken interest in Pro-Energy at 90%, with 45% attributed to Ross and 45% attributed to Gerken.

Shortly after Gerken transferred his shares, Ross increased the number of authorized shares of Pro-Energy from 500 shares to 10,000 shares. Ross was issued 9,000 shares, and 1,000 shares were issued to Dr. Wright.

After the apparent transfer of another 10% interest in Pro-Energy to another shareholder (McClellan), Ross transferred his remaining 80% interest in Pro-Energy stock to F. L. Ross Enterprises, Inc., an Ohio corporation solely owned by Fred Ross.

Gerken argues that his share of Pro-Energy should not be subject to dilution or diminution by the various Ross-controlled events, and that his original 50% share (or 45% if the Dr. Wright transfer is deemed to have been consented to by Gerken) should be traced and preserved without regard to the many events which may have intervened to affect the number and value of these shares. The Joint Plan of Arrangement, confirmed in the Chapter XI cases of F. L. Ross Enterprises, et al., contained the following provision:

"V.  ACQUISITION OF INTERESTS OF SHAREHOLDERS

Western Natural Gas Company as part of this Plan of Arrangement proposes to acquire the stock of the Debtors on the following terms and conditions:

A. *Stock of Fred L. Ross and Carolyn Ross.* As hereinbefore stated Fred L. Ross and Carolyn Ross (hereinafter referred to as "Ross"), own ninety percent (90%) of the stock of F. L. Ross Enterprises, Inc., the parent of the other Debtor corporations. Western Natural Gas Company shall acquire said ninety percent (90%) of the stock of F. L. Ross Enterprises, Inc. (including all of the stock of the other Debtor corporations owned by F. L.

Ross Enterprises, Inc.), from Ross, upon the following terms and conditions:

(1) The consideration to be paid by Western Natural Gas Company to Ross shall be 200,000 shares of its common stock valued at $3.00 per share for a total consideration of $600,000.00.

(2) Ross shall be entitled to an augmentation right (the right to receive additional shares of common stock of Western Natural Gas Company), based upon the value of certain assets and reserves of Debtors reduced by the total liabilities of all Debtors herein as reflected in the final statement of indebtedness in these Chapter XI proceedings. The present value of said assets shall be determined by agreement or appraisal and the present value of the reserves shall be determined by a study conducted by an independent geologist selected by mutual consent of Ross and Western Natural Gas Company.

(3) Should the present value of ninety percent (90%) of said assets and reserves in excess of the total liabilities of Debtors exceed the sum of $600,000.00, then in that event, Ross shall be entitled to additional shares of Western Natural Gas Company common stock on the basis of one (1) share for each three dollars ($3.00) of excess value. No additional shares shall be issued nor shall Ross be required to return shares to Western Natural Gas Company should the total liabilities exceed the value of ninety percent (90%) of said assets and reserves.

(4) In addition to the augmentation right hereinabove described relating to the net value of the assets and reserves of the Debtors, Ross shall be entitled to the same augmentation rights afforded to Class A and Class C creditors based upon the value in three (3) years of Western Natural Gas Company stock, as set forth in detail in Paragraph III hereof.

(5) Notwithstanding any provision of this plan, the 200,000 shares of Western Natural Gas Company to be delivered to Fred L. Ross and Carolyn Ross pursuant to this Part V shall be delivered to a trustee designated by the official credi-

tors' committee to be held and distributed as follows:

(1) If before the third anniversary date of issuance of the stock by the transfer agent, the augmentation rights have been discharged in accordance with Part III of the Plan; or

(2) On the third anniversary date of the issuance of the stock by the transfer agent, the exercise of the augmentation rights provide Class C creditors with stock having a market value equal to 100% of their allowed claim,

then said trustee shall deliver the 200,000 shares to Fred L. Ross and Carolyn Ross. If neither condition (1) nor (2) of this paragraph are met, the 200,000 shares shall be distributed pro-rata to Class C creditors originally receiving shares.

(6) As additional consideration to Western Natural Gas Company for the stock of F. L. Ross Enterprises, Inc., owned by Ross, Ross shall accomplish the following:

(a) Ross shall cause Ohio Energy Resources to transfer to Western Natural Gas Company upon confirmation of this Plan, the total working and overriding royalty interests of Ohio Energy Resources in the following programs:

| | | |
|---|---|---|
| Cambridge # 1 | Cambridge # 7 | Cambridge # 9 |
| Cambridge # 2 | D. Van Voorhis # 1 | N. Bashore # 1 |
| Cambridge # 3 | R. Cooperrider # 1 | R. Bell # 1 |
| Cambridge # 4A | J. W. Nethers # 1 | L. Dockray |
| Cambridge # 5 | P. Madden # 1 | |
| Cambridge # 6 | M. H. Barcley # 1 | |
| Osborn # 1 | | |
| Krouskouph # 1 | Cambridge # 8 | |
| Forsythe # 1 | D. Starling | |
| 1 Wetherholt # 1 | M. Frazier # 1 | |
| George Taylor # 2 | L. Brailer # 1 | |
| | J. J. Nethers # 2 | |
| | K. William # 1 | |

In exchange therefor, the Debtors and Western Natural Gas Company will release any and all claims which any of them may have against Ohio Energy Resources.

(b) Ross upon confirmation of this Plan shall cause his general partnership interests in the programs Cambridge # 1, Cambridge # 2, Cambridge # 3, Cambridge # 4 and Cambridge # 5 to be assigned and conveyed to Western Natural Gas Company.

(c) Prior to confirmation of this Plan of Arrangement, Ross shall obtain the release from Michael Gerken ("Gerken"), a former business associate of Fred Ross, of Gerken's claim of ownership of one-half (½) of the outstanding shares of F. L. Ross Enterprises, Inc. or any other Debtor. If Ross cannot obtain said release of Gerken prior to confirmation of this Plan of Arrangement, then, in that event, Western Natural Gas Company shall deposit with the Court sufficient shares of its common stock which were to be delivered to Ross, to satisfy the alleged claim of Gerken. The Court shall then determine Gerken's claim to one-half (½) of the stock of F. L. Ross Enterprises, Inc. or any other Debtor, and consequently, his right to stock of Western Natural Gas Company."

It is not clear to this Court what portion of the 200,000 shares referred to in the above-quoted passage represents what originally was the 45% ownership of Pro-Energy to which this Court has found Gerken has a meritorious claim. There is no other measure of damages supported in the record other than a tracing of the trust asset and the ordering of a turnover of that asset, in whatever form it may now exist, to its rightful owner. Gerken suggests in a trial brief that this asset is now represented by 45,000 shares of Western Natural Gas Company, those shares being part of the 200,000 shares now being held by a trustee under the provisions of the joint plan.

It is generally held that where there has been an unauthorized disposition of trust property, the trust follows such property into the hands of the transferee, unless the transferee is a bona fide purchaser for value. This tracing process can accommodate not only a change in the identity of the trust property (caused by sale or otherwise) but can also accommodate improvement to or value-enhancement of the trust property. 76 Am.Jur.2d, *Trusts*, §§ 254–255; 54 O.Jur.2d, Trusts, § 224, and § 202 *Restatement of Trusts, Second.*

The trust *res* in the present case is the 250 shares of Pro-Energy stock transferred from Gerken to Ross in February of 1976. At that time, these shares represented a 50% ownership interest in Pro-Energy. As has been previously noted, Ross' subsequent actions in increasing to 10,000 the amount of authorized and issued Pro-Energy shares, and in transferring a 10% interest in Pro-Energy to Michael Wright (as previously agreed to by Gerken), converted the trust *res* to 4,500 shares of Pro-Energy. While it is clear that subsequently the shares of Pro-Energy were exchanged for shares of F. L. Ross Enterprises, Inc., a parent company, there is little direct evidence in the record to establish what portion of the F. L. Ross shares can be traced to the trust *res* of 4,500 shares of Pro-Energy.

However, a further portion of the Joint Plan of Arrangement gives this Court a standard by which to convert the trust *res* to an equivalent number of Western Natural Gas Company shares. The Joint Plan provides, with respect to the 10% ownership interest of Michael Wright in Pro-Energy, that:

"D. *Stock of Dr. Michael Wright.* As hereinbefore stated Dr. Michael Wright (hereinafter referred as "Wright"), owns ten percent (10%) of the stock of Pro-Energy Services, Inc., a subsidiary of F. L. Ross Enterprises, Inc., which owns eighty percent (80%) of said stock. Western Natural Gas Company shall acquire said ten percent (10%) of the stock of Pro Energy Services, Inc., from Wright, upon the following terms and conditions:

(1) The consideration to be paid by Western Natural Gas Company to Wright shall be 10,000 shares of its common stock valued at $3.00 per share for a total consideration of $30,000.00.

(2) Wright shall not be entitled to an augmentation right for the sale of his shares of Pro Energy Services, Inc., based upon the value of the net assets and reserves of Pro Energy Services, Inc. Wright shall be entitled, however, to the same augmentation right afforded to Class A and Class C Creditors based upon the value in thre (sic) (3) years of West-

ern Natural Gas Company stock, as set forth in detail in Paragraph III hereof."

Under this provision of the Joint Plan, Wright is to receive 10,000 shares of Western stock for his 1,000 shares of Pro-Energy stock. The conversion ratio thus established for the exchange of Western shares for Pro-Energy shares is ten to one. Applying this ratio, then, to the trust *res* of 4,500 shares of Pro-Energy, the Court finds that the trust *res* can be traced to and expressed as 45,000 shares of Western stock.

The Court hereby finds that the damages to be awarded to Gerken on account of Ross' breach of their express trust agreement shall be the imposition of a constructive trust upon 45,000 shares of Western Natural Gas Company which, under the provisions of the Joint Plan of Arrangement, might otherwise be issued to Ross. This constructive trust will be subject to all the terms and conditions that might otherwise be a part of the Joint Plan of Arrangement, and this issuance of Western shares (with any "augmentation rights" that may be accrued) shall be made to Gerken only when Ross' rights to such shares shall mature under such Joint Plan. No other damages are considered proved or appropriate in this case and none are awarded.

A judgment shall issue forthwith.

IT IS SO ORDERED.